## ATTACHMENT A

### STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of New York (collectively, the "Fraud Section and the Office") and Telia Company AB. Telia Company AB admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, Telia Company AB agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the Criminal Information attached to this Agreement.

## I.   Introduction

### A.   The Uzbek Regulatory Regime for Telecommunications

1.     The Uzbek Agency for Communications and Information ("UzACI") was an Uzbek governmental entity authorized to regulate operations and formulate state policy in the sphere of communication, information, and the use of radio spectrum in Uzbekistan. As such, UzACI was a "department," "agency," and "instrumentality" of a foreign government, as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(f)(1); 78dd-2(h)(2); and 78dd-3(f)(2).

## B. TELIA and Other Relevant Entities and Individuals

2.      From in or around 2002 to the present, Telia Company AB, formerly named TeliaSonera AB ("TELIA"), was a multinational telecommunications company headquartered and incorporated in Sweden. During the period of in or around 2002 until on or about September 5, 2007, TELIA maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, Title 15 United States Code Section 78*l*, and was required to file periodic reports with the SEC under Section 15(d) of the Securities Exchange Act, Title 15 United States Code Section 78o(d). Accordingly, during that time period, TELIA was an "issuer" as that term is used in the FCPA.

3.      TELIA had direct and indirect subsidiaries and engaged in joint ventures in various countries around the world through which it conducted telecommunications business. During the relevant time frame, TELIA employed over 20,000 people in six operating business areas organized based on geographic territory.

4.      Executive A was a high-ranking executive of TELIA who had authority over TELIA's Eurasian Business Area.

5.      As described below, in or around 2007, TELIA began operating its mobile telecommunications business in Uzbekistan through its indirect subsidiary Coscom LLC ("Coscom"), which was headquartered and incorporated in Uzbekistan.

6.      TELIA indirectly owned 100% of TeliaSonera UTA Holding B.V. ("Telia UTA"). From in and around December 2007 to the present, Telia UTA held between 74% and 94% of TeliaSonera Uzbek Telecom Holding B.V. ("Telia Uzbek"). Telia Uzbek held 99.97% of Coscom, and the remaining .03% was held directly by Telia UTA.

2

7.     "Foreign Official," an individual whose identity is known to the United States, was an Uzbek government official and a relative of a high-ranking Uzbek government official. The Foreign Official had influence over decisions made by UzACI. The Foreign Official was a "foreign official" as that term is used in the FCPA.

8.     "Shell Company" was a company incorporated in Gibraltar that was beneficially owned by the Foreign Official.

9.     "Associate A," an individual whose identity is known to the United States, was the Foreign Official's close associate. When the Shell Company was incorporated in 2004, Associate A was approximately 20 years old and was the Shell Company's purported sole owner and director.

10.     "Associate B," an individual whose identity is known to the United States, was a chief executive at one of Coscom's primary competitors in Uzbekistan. Associate B also represented the Shell Company and the Foreign Official in their business dealings with TELIA and its subsidiaries, including Coscom.

## II. Overview of the Corrupt Bribery Scheme

11.     As discussed in more detail below, TELIA, Executive A, and Coscom conspired with others to make approximately $331 million in corrupt payments to the Foreign Official in exchange for the Foreign Official's agreement to expand TELIA's and Coscom's share of Uzbekistan's telecommunications market. Executive A and certain management and employees within TELIA and affiliated entities (hereinafter referred to singularly and collectively as "certain TELIA management") and certain management and employees of Coscom (hereinafter referred to singularly and collectively as "certain Coscom management") understood that they had to regularly pay the Foreign Official millions of dollars in order to enter the Uzbek

3

telecommunications market and continue to operate there. As a result of its corrupt conduct,

TELIA's pecuniary gain was approximately \$457 million from its Uzbek telecommunications

operations.

12.     As described in more detail below, TELIA took the following corrupt actions and

made the following corrupt payments, totaling approximately \$331,200,000, to benefit the

Foreign Official in order to enter and continue to operate in Uzbekistan:

a.     First, before entering the Uzbek market, Executive A and certain TELIA

management understood that TELIA was required to enter into a corrupt partnership with the

Foreign Official in order to operate in Uzbekistan. Certain TELIA management negotiated the

terms of the corrupt partnership with Associate B, who represented the Foreign Official.

b.     On or about July 4, 2007, Telia UTA entered into a cooperation agreement

with Associate B, who signed the agreement on behalf of the "Uzbek Partner." The "Uzbek

Partner" was defined in the agreement as Associate B "or his nominee," though Executive A and

certain TELIA management knew Associate B was acting on behalf of the Foreign Official. The

cooperation agreement set forth basic terms that later would be formalized as part of a

Shareholders Agreement, including that the "Uzbek Partner" would receive a net balance of \$30

million and shares of Telia Uzbek, the 99.97% owner of Coscom, with the option to sell the

shares back to Telia UTA at a substantial profit for the Foreign Official.

c.     Soon after the cooperation agreement was signed, in or around August

2007, Executive A and certain TELIA management authorized a corrupt bribe payment of

approximately \$2 million to be made by certain Coscom management to Associate B for the

benefit of the Foreign Official.

4

d.      In or around December 2007, TELIA acquired 3G frequencies for Coscom through a payment to the Shell Company of $80 million. In or around the same time, a TELIA subsidiary entered into a corrupt Shareholders Agreement with the Shell Company whereby the Shell Company acquired an indirect 26% ownership interest in Coscom for $50 million, with the right for the Shell Company to exercise an option to sell shares back at a substantial profit. The net result of these transactions was that TELIA made, through the Shell Company, a $30 million bribe payment to the Foreign Official and transferred an indirect 26% ownership interest in Coscom to the Foreign Official, along with a valuable put option, as contemplated in the July 4, 2007, cooperation agreement, which Executive A and certain TELIA management understood was necessary for TELIA to enter the Uzbek telecom market.

e.      In or around September 2008, Telia Uzbek paid a $9.2 million bribe to the Shell Company to benefit the Foreign Official and facilitate Coscom's acquisition of a number series and network codes, as well as to continue to conduct business in Uzbekistan.

f.      In or around February 2010, Executive A and certain TELIA management authorized a $220 million bribe payment to the Shell Company to benefit the Foreign Official in order to continue its telecom business in Uzbekistan, after the Shell Company exercised its option under the Shareholder Agreement to sell back 20% of its 26% ownership interest in Coscom.

g.      In or around April and May 2010, Telia Uzbek entered into a series of agreements through which Telia Uzbek agreed to pay $15 million to a third-party vendor to assume a debt owed by a Swiss company that Executive A and certain TELIA management knew was beneficially owned by the Foreign Official. Shortly thereafter, TELIA forgave the debt owed by the Foreign Official's Swiss company in order to benefit the Foreign Official. In

5

return for this bribe, the Foreign Official enabled Coscom to obtain certain 4G frequencies and continue to do business in Uzbekistan.

        h.     During TELIA's entry to the Uzbek telecommunications market, TELIA and its subsidiaries used both U.S. citizens and U.S. companies (collectively "TELIA agents") to aid in establishing a corrupt relationship with the Foreign Official. Each TELIA agent was a "domestic concern" as that term is used in the FCPA.

        i.     Certain TELIA management and TELIA agents used U.S.-based email accounts to communicate with others and effectuate the scheme. In addition, TELIA and Coscom made and caused to be made, numerous corrupt payments that were routed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

        j.     During TELIA's entry to the Uzbek telecommunications market, at least one TELIA executive sent emails in furtherance of the corrupt scheme "while in the territory of the United States" as that term is used in the FCPA.

### III.  The Corrupt Bribery Scheme

## A. The Formation of TELIA's Corrupt Partnership with the Foreign Official in 2007

       13.     In or around 2006 and 2007, TELIA sought to acquire a telecommunications company operating in Uzbekistan as part of its strategic plan of expansion in Eurasia. Executive A and certain TELIA management determined that a particularly attractive acquisition target was a U.S.-based telecommunications company that was the parent company of Coscom in Uzbekistan (referred to collectively as the "Acquisition Target"). At the time, the Acquisition Target had been engaged in negotiations with potential buyers from Russia and Qatar, but the

owners of the Acquisition Target learned that Uzbek authorities opposed the sale of Coscom to Russian or Qatari buyers.

14.     On or about February 7, 2007, UzACI forced Coscom to shut down its telecom network for ten days, causing a large loss of revenue and subscribers.

15.     Executive A and certain TELIA executives learned of the government's shutdown of Coscom, and that the Uzbek authorities wanted a European company to enter the Uzbek market to compete with the two existing Russian telecommunications companies in Uzbekistan. On or about February 20, 2007, certain TELIA management, including Executive A, a TELIA agent, and others emailed about their "multi-channel effort to relay the message to the Uzbek[] authorities. . . . This multichannel effort includes some very influential Eurasian people as well as people on the ground who are close to the [Foreign Official's high-ranking relative's] family circles."

16.     On or about March 8, 2007, TELIA made a nonbinding offer to the Acquisition Target, which was conditioned upon a number of things, including TELIA finding a "strong local partner" in Uzbekistan.  On March 13, 2007, the TELIA board of directors received a presentation on the acquisition opportunity, including the need for local partners.  The board adopted a resolution "to conduct the negotiations and allocate the relevant corporate resources to conduct the due diligence of [the Acquisition Target] and its portfolio of mobile operators in Uzbekistan . . . ."

17.     Executive A and certain TELIA management, with the help of TELIA agents and others, settled on the Foreign Official as the "strong local partner" that TELIA needed to do business in Uzbekistan, as demonstrated, in part, by the following:

- On or about March 16, 2007, certain TELIA management received a "[c]onfidential" email explaining that a TELIA letter had been "delivered to [the Foreign Official's

7

high-ranking relative]," it "went through the hands of [the Foreign Official and the Foreign Official's people who] were ready to meet on the subject," and there was a planned meeting with Associate B, "one of [the Foreign Official's] key person [sic] in the Telecom area."

- On or about March 20, 2007, certain TELIA management emailed other members of the acquisition team, including Executive A, that "[t]hrough various channels, we got to [the Foreign Official]'s telecom team and I have a scheduled meeting with [the Foreign Official's] CEO in charge of telecoms in Almaty on April 2nd. I also get the news from another channel that [the Foreign Official] would like to meet with a senior decision-maker of our group."

- On or about March 24, 2007, certain TELIA management emailed other members of the acquisition team, including Executive A, with an update: "We have received . . . confirmation that the Uzbekh [sic] authorities are fine with our potential acquisition . . . . We initiated several channels to get to [the Foreign Official's high-ranking relative]'s top elite who deal with the telecoms sector. . . . As a result of that, we have . . . [a] potential meeting with [the Foreign Official and the Foreign Official's] telecom colleagues soon. . . ."

- On or about April 2, 2007 and April 3, 2007, certain TELIA management, including Executive A, received an independent report that TELIA commissioned on the "Political Risk in the Telecommunications Sector of . . . Uzbekistan." The report included a section on "[f]urther potential issues" concerning which the author offered to provide "detailed analysis," including "[the Foreign Official] and [the Foreign Official's] relation to the proposed investment," including that "[i]t may be tempting to work in parallel or even through [the Foreign Official] . . . the more so because the [Foreign Official is] interested in the telecommunications industry. . . ."

- On or about May 15, 2007, Executive A received an internal memo summarizing what ultimately mirrored some of the key terms of the final partnership deal, including the Foreign Official's involvement. In relevant part, the memorandum stated, "Negotiations with the potential Uzbekh [sic] Partner: I made two trips to Tashkent in the last month and now have a preliminary hand-shake for principles of a potential partnership with [Associate B], the person who is the Chief Executive for [the Foreign Official]'s investment group. We are hoping to sign a Term Sheet with them within the next 10-15 days. [Associate B] will also come to Istanbul upon my invitation to meet with [Executive A] and the team. According to the proposed deal, the new local partners will [] bring in new . . . 3G frequencies as well as some technically value-adding assets, such as number blocks, into the company in exchange for 26% of the Uzbekh [sic] venture plus USD 32.5 millions [sic]." A similar memorandum was circulated among certain TELIA management, including Executive A, on May 17, 2007, as well.

18.     Having made the decision to partner with the Foreign Official, TELIA was ready to formally acquire the Acquisition Target.  On or about June 5, 2007, certain TELIA management, including Executive A, traveled to Tashkent to participate in separate meetings with Associate B and the owners of the Acquisition Target.  On or about June 6, 2007, a TELIA subsidiary entered into a Memorandum of Understanding for the purchase of the Acquisition Target.

19.     In materials for a June 11, 2007 board meeting created by certain TELIA management, including Executive A, about the acquisition, they took care to avoid any reference to the partnership with the Foreign Official.  Instead, the Foreign Official's involvement was referred to only as a "strong local group who owns [Uzbek Bank], a leading bank in Uzbekistan and with business interests in various industries."

20.     On or about June 11, 2007, the TELIA board of directors approved the acquisition with the condition "that a partnership agreement is signed with a suitable local partner no later than simultaneously with the transaction documents . . . ."

21.     On or about June 20, 2007, certain TELIA management received an update from an outside legal advisor on the "Uzbek Partner Status," which documented the ongoing negotiations with Associate B.  The update included a specific recommendation that TELIA structure the acquisition so as to remove itself from U.S. jurisdiction due to the FCPA:

> The relations with the Uzbek partner is [sic] rather delicate.  As you know we are dealing with [Associate B], who is the general manager of [one of Coscom's primary competitors in Uzbekistan].  Contacts [of certain TELIA management] indicated that [Associate B] has the power to stri[ke] a deal on behalf of [the Foreign Official].  I attended two meetings with [Associate B] and at least at the second meeting, [Associate B] indirectly confirmed this. . . . During these meetings, [Associate B] asked [certain TELIA management] to come to [Associate B's] office and they had rather long private meetings. . . .

9

We need to sign the Term Sheet and then the Option Agreement before the signing [of] the Merger Agreement with [the Acquisition Target]. This will require substantial negotiations with the Uzbek Partner. . . .

It is important to take Coscom out of US structure for a couple of reasons including the FCPA. Let's discuss this in a telephone conversation when you are available. . . .

22.    On or about July 3, 2007, TELIA's board of directors convened a teleconference concerning the acquisition. TELIA's board resolved to proceed with the acquisition of Acquisition Target through a wholly owned subsidiary for approximately $410 million plus $30 million for the acquisition of additional assets in Uzbekistan. In written materials, the TELIA board received an update from certain TELIA management, including Executive A, on the status of the local partnership agreement, which remained a condition of the board's June 11, 2007 decision to pursue the acquisition. The materials explained that a binding term sheet was expected to be signed the following day, that a merger with the local partner's company would be expected within three weeks after the acquisition, and UzACI would provide a letter supporting TELIA's entry into the Uzbek market prior to the merger.

23.    On or about July 4, 2007, after weeks of negotiations with Associate B, Executive A signed a cooperation agreement on behalf of Sonera Hungary Holding B.V., which was later renamed Telia UTA, and the "Uzbek Partner." The "Uzbek Partner" was defined in the agreement as Associate B "or his nominee," though Executive A and certain TELIA management knew Associate B was acting on behalf of the Foreign Official. The July 4, 2007 cooperation agreement was signed by Associate B on behalf of the Uzbek Partner. Among other things, the cooperation agreement provided for the unnamed Uzbek Partner to provide licenses and frequencies to Coscom, and the Uzbek partner would receive a net balance of $30 million.

The "Key Principles" of the agreement included an option for the Uzbek partner to sell back shares approximately three years later.

24.     The agreement with the Acquisition Target was entered into on or about July 6, 2007, and the acquisition was completed through payments and transfer of ownership on or about July 16, 2007.

25.     Soon thereafter, on or about July 23, 2007, Associate B forwarded a letter from UzACI to certain TELIA management "express[ing] its gratitude" and showing a positive reaction to TELIA's interest in entering the Uzbek telecommunications market.

**B.   TELIA's Corrupt $2 Million Bribe Payment in August 2007**

26.     In or around August 2007, certain TELIA management, including Executive A, ordered a Coscom executive to make a corrupt, cash payment of approximately $2 million directly to the Foreign Official's representative, Associate B.  In an email months later, one of the Coscom executives who executed the corrupt transaction complained to certain TELIA management, including Executive A, about how the Coscom executive's honor had been "spoiled" by the company when he was directed to make the "illegal transaction" to "our local partner['[]s lia[i]son in the lobby of [a hotel] here in Tashkent."

**C.   TELIA's Corrupt Partnership with the Foreign Official and Its $30 Million Bribe Payment to the Foreign Official via the Shell Company in December 2007**

27.     Over the next two months, certain TELIA management engaged in final partnership negotiations with Associate B, who they knew was acting on behalf of the Foreign Official and the Shell Company.

28.     In an email sent on or about November 21, 2007, a TELIA executive explained to certain TELIA management, including Executive A, the payment structure proposed by Associate B, which followed the precedent "used in the [other major telecom companies'] entries

into Uzbekistan" and involved TELIA paying $80 million to the Foreign Official for 3G frequencies and number blocks, and the Shell Company paying Telia UTA $50 million for a 26% share of the ownership of Coscom.

29.     At the time, however, certain TELIA management knew that the proposed structure was risky insofar as there was no legal way to directly transfer frequencies in Uzbekistan. Indeed, on or about December 3, 2007, certain TELIA management received a legal opinion that "the right to use allocated radio frequencies cannot be transferred to other legal entities; a transfer of the ownership, privatization and permanent (termless) allocation of the radio frequencies . . . is not permitted. . . . [the Shell Company's Uzbek subsidiary] is not an owner of the allocated radio frequencies and therefore it is not entitled to dispose (sell, gran[t], etc) thereof. We believe. . . the Agreement shall be construed as invalid due to the contradiction to the applicable Uzbek legislation . . . [because] a transfer (by holder) of the issued license to other persons *is prohibited*."

30.     On or about December 14, 2007, Telia Uzbek entered into a contract with the Shell Company, which provided that the Shell Company would be paid a total of $80 million if the Shell Company's Uzbek subsidiary sent a formal letter to UzACI repudiating its rights to use certain 3G frequencies and a numbering block (the "3G Agreement"). On or about December 17, 2007, Telia UTA also entered into a Share Purchase Agreement with the Shell Company, through which the Shell Company would receive the right to purchase a 26% ownership interest in Telia Uzbek for $50 million after the conditions of the 3G Contract were fulfilled (the "Share Purchase Agreement"). The Share Purchase Agreement also included a put option, which gave the Shell Company the option to sell shares back to Telia UTA after December 31, 2009 at a substantial profit to the Shell Company. A third agreement also was entered into between Telia

12

UTA, Telia Uzbek, and the Shell Company (the "Shareholders Agreement"), which set forth certain agreements concerning the ownership and operation of Telia Uzbek and was conditioned upon the fulfillment of the conditions of the Share Purchase Agreement. All of these agreements were signed by Executive A on behalf of the TELIA entities and by Associate A on behalf of the Shell Company, a person whom the TELIA representatives had never met and who had never participated in any negotiations.

31.     On or about December 17, 2007, the Shell Company's Uzbek subsidiary repudiated 3G frequencies it had only just acquired from UzACI on or about November 1, 2007.

32.     On or about December 27, 2007 UzACI issued a decision accepting the repudiation and reallocating the frequencies to Coscom. On or about that same day, an email from Associate B was forwarded to certain TELIA management, including Executive A, that included copies of the new frequencies being reallocated to Coscom and a request from Associate B that the agreed-upon payments to the Shell Company be made. On or about that same day, TELIA transferred approximately $80 million to the Shell Company's bank account in Riga, Latvia, through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

33.     On the following day, on or about December 28, 2007, the Shell Company transferred approximately $50 million to Telia UTA to purchase the 26% ownership interest in Telia Uzbek. Certain TELIA management, including Executive A, understood that the net result of this transaction and the 3G Agreement was that TELIA was giving the Foreign Official $30 million, a 26% ownership interest in Coscom, and the option to obtain a much larger payment at a later date. Indeed, as explained below, the Foreign Official caused the Shell Company to

13

exercise its put option in or around February 2010, causing Telia UTA to buy back 20% of the
Shell Company's 26% ownership interest in Telia Uzbek for approximately $220 million.

**D. TELIA's $9.2 Million Bribe to the Foreign Official via the Shell Company in 2008**

34.     After the Shareholders Agreement was finalized with the Shell Company, certain
TELIA management traveled to Tashkent to meet with certain Coscom management and Uzbek
government officials between January 6 and 11, 2008. An email from an Istanbul-based public
relations firm to certain TELIA management, including Executive A, on or about January 3,
2008, described the purpose of the trip, including the importance of meeting with government
officials, which "means not only having personal relations with influential people, but also
influencing the influential people." (emphasis in original). Certain TELIA management and the
Foreign Official met during the Tashkent trip.

35.     In the summer of 2008, certain TELIA management, including Executive A,
negotiated with Associate B and authorized a $9.2 million bribe payment to the Foreign Official,
through the Shell Company. The payment purportedly was for Coscom to acquire a number
series of one million numbers and a network code, and the payment was structured along the
same lines as the payment for the transfer of 3G frequencies in 2007.

36.     The 2008 agreement with the Shell Company and accompanying $9.2 million
payment was approved by certain TELIA management, including Executive A, without the need
for approval by the TELIA board of directors. On or about September 15, 2008, certain TELIA
management, including Executive A, received and approved a memo seeking authorization to
execute the agreement with the Shell Company. On or about September 16, 2008, Telia Uzbek
transferred $9.2 million to the Shell Company's bank account in Riga, Latvia, through

14

transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

**E. TELIA's $220 Million Bribe to the Foreign Official via the Shell Company in 2010**

37.     The December 2007 Shareholders Agreement granted the Shell Company the right to sell back shares in Telia Uzbek to Telia UTA after December 31, 2009. On or about January 18, 2010, certain TELIA management, including Executive A, drafted and sent a memorandum to the TELIA board of directors seeking approval to purchase 20% of the Shell Company's 26% interest for a price not to exceed $220 million. As described in the memorandum, "[i]n the second half of December 2009, [the Shell Company] approached [TELIA] with the request to sell all or part of their stake in [Coscom]." The memorandum explained the predetermined sale price in the Shareholders Agreement as $112.5 million if the Shell Company exercised its option in 2010, and "if they exercise the right in 2011 or later, the price shall be the higher of USD 150 million and fair market value, currently in the magnitude of USD 250 million for 26 percent." The memorandum further explained that "[t]he objective is to maintain a good relationship with [the Shell Company] and extend the period they stay as a shareholder as long as possible," noting that the Shell Company could assist with currency conversion issues and with "the assurance of renewal of licenses including a new LTE license . . . ."

38.     On or about January 22, 2010, TELIA's board of directors discussed the proposal to repurchase 20% of the Shell Company's 26% of ownership interest in Telia Uzbek. Certain TELIA management, including Executive A, set forth for the board of directors the terms of the proposed deal, including that the Shell Company would retain a 6% ownership stake and be required to stay in the partnership for at least another three years, at which point the floor price

15

for the sale of the remaining shares would be approximately $50 million. At one point,

Executive A described the local partner as powerful, and explained that TELIA had the same

local partner as a Coscom's competitor and that no one has dared to attack the company so far.

Ultimately, the board approved the acquisition of the 20% interest "at a price not exceeding USD

220 million. . . ."

     39.     On or about January 25, 2010, Telia UTA, through certain TELIA management,

entered into an agreement with the Shell Company through which the Shell Company agreed to

sell 20% of its 26% ownership interest in Telia Uzbek for $220 million. In addition, on or about

that same day, Telia UTA, Telia Uzbek, and the Shell Company entered into an Amendment

Agreement to the Shareholders Agreement in which the Shell Company retained the right to sell

its remaining 6% ownership interest after on or before February 15, 2013, for a floor price of $50

million. Both agreements were signed by certain TELIA management and by Associate A, on

behalf of the Shell Company. On or about February 2, 2010, TELIA authorized a payment on its

behalf of $220 million to the Shell Company's bank account in Hong Kong, through transactions

into and out of correspondent bank accounts at financial institutions in New York, New York.

## F. TELIA's $15 Million Corrupt Payment to Benefit the Foreign Official and Obtain 4G Frequencies in May and June 2010

     40.     On or about January 14, 2010, certain Coscom management emailed certain

TELIA management, including Executive A, about a meeting with Associate B, in which they

realized that Coscom was getting "only a wording addition to [Coscom's] current . . . licenses"

and would not "be granted frequency band" for 4G. Discussions with Associate B regarding

obtaining 4G frequencies continued over the next few months, with Associate B meeting in

person with certain TELIA and Coscom management various times.

16

41.    In or around April 2010, TELIA agreed to make a $15 million corrupt payment to benefit the Foreign Official in order to obtain certain 4G frequencies. The corrupt payment involved multiple transactions, in which TELIA essentially agreed to pay $15 million to a third-party vendor to assume a debt owed to that vendor by a Swiss company that was beneficially owned by the Foreign Official in exchange for purported "consulting services." To effectuate the corrupt payment, certain TELIA management, including Executive A, agreed to execute four separate agreements, which they understood would ultimately benefit the Foreign Official.

42.    First, Telia Uzbek, a Swiss company that was beneficially owned by the Foreign Official ("Foreign Official's Swiss Company"), and a third-party vendor that was owed a debt by the Foreign Official's Swiss Company entered into an agreement, dated on or about April 14, 2010, in which Telia Uzbek agreed to acquire $15 million of the debt that the Foreign Official's Swiss Company's owed to the third-party vendor.

43.    Second, Telia Uzbek entered into an undated agreement with the third-party vendor further governing the terms of purchase of the $15 million receivable against the Foreign Official's Swiss company.

44.    Third, Telia Uzbek and the Foreign Official's Swiss Company entered into an agreement, dated on or about April 15, 2010, whereby the Foreign Official's Swiss company agreed to assist Coscom in acquiring certain 4G frequencies and not seek payment for such assistance, and in return, Telia Uzbek would forgive the Foreign Official's Swiss Company's $15 million debt after the 4G frequencies were obtained by Coscom.

45.    Finally, Telia UTA, Telia Uzbek, and the Shell Company entered into a second amendment to the Shareholders Agreement on or about May 31, 2010, which increased the floor

17

price for the Shell Company's option to sell its 6% ownership interest in Telia Uzbek from $50 million to $75 million.

46.    Certain TELIA management, including Executive A, handled and approved the transactions discussed above. On or about June 7, 2010, the TELIA board of directors met by teleconference and certain TELIA management explained to them that the deal resulted after "[o]ur Uzbek partners came into financial difficulties . . . ."

47.    On or about June 7, 2010, Associate B emailed certain TELIA management, including Executive A, for payment of the $15 million. That same day, certain TELIA management responded, "as discussed over the phone, we'll wait for the copy of the Amended License Agreement executed by all parties, including the regulator [UzACI] and [a Coscom executive], before we make payment."

48.    On or about June 11, 2010, UzACI issued a decision granting Coscom the right to use certain 4G frequencies that had previously been awarded to, and subsequently waived by, a Coscom competitor in Uzbekistan, for which Associate B served as chief executive officer. On or about the same day, a member of TELIA management, copying Executive A, sent Associate B confirmation that instructions had been made to make payment. On or about June 15, 2010, Telia Uzbek transferred $15 million to the third-party vendor to satisfy its obligations under the agreements. The $15 million payment was made through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

## G. TELIA's $55 Million Bribe to the Foreign Official via the Shell Company in December 2010

49.    In or around November and December 2010, TELIA entered into another corrupt transaction with the Shell Company to pay a bribe to the Foreign Official in return for additional 4G frequencies and assistance in obtaining a long-term agreement to lease a fiber optic network

18

from the Uzbek state telecom operator, Uzbektelecom. In or around September 2010, Associate B began discussions with certain TELIA management concerning a proposed services agreement between the Shell Company and Telia Uzbek. On or about October 17, 2010, certain TELIA management, including Executive A, drafted a proposal for the TELIA board of directors to review, which explained that the Shell Company, "a local Uzbek partner with good local market knowledge and good political connections," had offered Coscom additional 4G frequencies and the opportunity to lease fiber optic network from Uzbektelecom. The cost of the proposed deal was $75 million, with $20 million payable to Uzbektelecom in return for a 20-year lease and $55 million payable to the Shell Company. Certain TELIA management, including Executive A, estimated that the deal created "significant savings with a total present value of approximately USD 165 million." TELIA's board approved the transaction during a board meeting on or about October 22, 2010.

50.     On or about November 1, 2010, Telia Uzbek entered into an agreement with the Shell Company, in which the Shell Company agreed to "conduct[] negotiations, preparation, submission, and support documentation packages required" to obtain permission from UzACI for Coscom to use certain 4G frequencies and to execute a long-term lease agreement with Uzbektelecom. In exchange, Telia Uzbek agreed to pay $55 million to the Shell Company. The agreement was signed by Associate A on behalf of the Shell Company.

51.     On or about November 26, 2010, UzACI granted Coscom the right to use certain 4G frequencies, which had previously been held and waived by a Coscom competitor in Uzbekistan for which Associate B served as chief executive officer.

52.     After the 4G frequencies were granted to Coscom, certain TELIA management, including Executive A, sought to fabricate a justification for the $55 million payment to the Shell

19

Company, because, unlike with the 3G frequency transaction, the Shell Company never held the relevant frequencies and therefore did not repudiate them. On or about December 6, 2010, Executive A emailed certain TELIA management, copying Associate B, proposing language for confirmation from the Shell Company that "payment to the State of Uzbekistan for the acquisition of authorizations and permits to use radio frequency bands from [Uzbek agencies, including UzACI] amounted to USD 54,000,000." On or about the same day, Associate B replied to certain TELIA management that the "only acceptable" confirmation from the Shell Company was that the "[the Shell Company] has incurred substantial expenses related to the execution of the [November Agreement]." On or about later that same day, Executive A and Associate B had a conversation about "a new version of the side letter." Ultimately, on or about December 10, 2010, the Shell Company submitted to Telia Uzbek a "Confirmation" that "the sum paid under the [November Agreement] includes payment for not exercising [the Shell Company]'s option to acquire the frequencies in question," despite there being no evidence that the Shell Company ever held such an option.

53.     On or about December 16, 2010, TELIA transferred $55 million to the Shell Company's Swiss bank account, which was routed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

## H. TELIA's Contemplation of Additional Bribe Payments and TELIA's Ongoing Relationship with the Shell Company

54.     On or about April 21, 2012, TELIA received an anonymous complaint concerning certain Coscom management that was circulated among certain TELIA management, including Executive A, alleging, among other things, that "when [TELIA] took [the] Uzbekistan project, they promised 40MUSD and certain amount of stocks to the [Foreign Official]" and that the Foreign Official "was made partner for free."

20

55.    In or around September 2012, Swedish public television broadcast a documentary that exposed TELIA's corrupt dealings with the Foreign Official and the Shell Company in Uzbekistan, and caused TELIA to initiate an internal investigation. Soon thereafter, the Swedish Prosecution Authority also opened an investigation into TELIA's corrupt dealings in Uzbekistan.

56.    Notwithstanding the open investigations and public allegations of corruption, including against the Foreign Official and the Shell Company, TELIA failed to sever ties with the Shell Company, and certain TELIA management even considered paying more bribes to benefit the Foreign Official. For example, in or around October 2012, certain TELIA management considered entering into a service agreement that would have included $20 million in payments to benefit the Foreign Official, and certain TELIA management understood that efforts would have to be taken so that the agreements "won't be signed on behalf of [the Shell Company]."]." Although such an agreement was never executed, the Shell Company did remain a minority shareholder in Telia Uzbek until in or around the fall of 2015. At that time, Dutch authorities seized the Shell Company's shares in Telia Uzbek, which was incorporated in the Netherlands.

21